NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Strafford
No. 2019-0265

THE STATE OF NEW HAMPSHIRE

v.

BENJAMIN M. MACKENZIE

Argued: October 21, 2021
Opinion Issued: April 8, 2022

John M. Formella, attorney general (Zachary L. Higham, assistant attorney general, on the brief and orally), for the State.

Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.

BASSETT, J. The defendant, Benjamin M. Mackenzie, appeals his conviction, following a jury trial in the Superior Court (Houran, J.), on one count of distribution of a controlled drug — fentanyl — with death resulting. See RSA 318-B:2, I (2017); RSA 318-B:26, IX (2017). He argues that the trial court erred when it: (1) admitted, as habit evidence under New Hampshire Rule of Evidence 406, testimony that the victim had previously purchased opioids from the defendant; and (2) admitted, as "intrinsic" to the charged crime, text messages between a cellphone alleged to belong to the defendant and other apparent drug customers. We affirm.

The record supports the following facts. In December 2016, the victim resided with her parents in Rochester. On December 12, at approximately 10:00 p.m., the victim told her parents she was going out and left the home. Thereafter, the victim exchanged text messages with the user of a cellphone associated with the number XXX-3908 (the 3908 phone). The victim texted that she "[n]eed[ed] a 30" and the recipient of the text replied "[g]etting it ready" and later "I'm looking for my scale." The victim and the user of the 3908 phone exchanged texts about their respective locations and set up a time and place to meet. The communication between the two individuals concluded with two brief calls occurring shortly before 11:00 p.m. The victim returned home soon thereafter, went to her bedroom, locked the door, and injected a fatal dose of fentanyl. The next morning, her parents discovered her body and called 911.

In the course of investigating the victim's death, the Rochester Police Department extracted data from the victim's cellphone, including records of text messages and calls, and obtained records pertaining to the 3908 phone pursuant to a search warrant. The police were unable to identify the owner of the 3908 phone using those records because it was a "prepaid phone" for which subscriber information was not available.

Nevertheless, the police discovered other evidence linking the 3908 phone to the defendant. The victim's phone records demonstrated that the victim had labeled the contact associated with the 3908 number as "Ben Mackenzie." The 3908 phone records also implicated the defendant in that they contained text messages to the user of the 3908 phone from the defendant's mother and brother, including one text from his mother referring to the phone user as "Ben." Additionally, the police interviewed an individual who, based upon the phone records, was frequently in contact with the 3908 phone user, and who identified the defendant as the owner of that phone. The police also interviewed the defendant. He acknowledged that he had met the victim "a couple of times" but told the police that he had never owned a cellphone. Following further investigation, a grand jury indicted the defendant on one count of distribution of a controlled drug with death resulting in connection with the victim's death. See RSA 318-B:2, I; RSA 318-B:26, IX.

At trial, the State's theory was that the 3908 phone records demonstrated that the defendant acquired fentanyl on December 12 and then sold it to customers that evening and throughout the next day — including a sale to the victim. In support of this theory, the State adduced evidence that the defendant was the exclusive user of the 3908 phone, including the text from the defendant's mother to the phone user referring to that person as "Ben," and testimony that, approximately two and a half months prior to the victim's death, the defendant represented on employment paperwork that the 3908 number was his. To prove that the user of the 3908 phone — allegedly the defendant — sold the victim the fatal dose of fentanyl, the State relied upon

2

text messages between the 3908 phone user and the victim on the night of her death, which the State's expert testified demonstrated that the victim "was about to meet up [with the 3908 phone user] to buy .30 of fentanyl [or] heroin." The State also elicited testimony from a close friend of the victim that the victim said, in December 2016, that she "had gotten drugs" — specifically opioids — "off of [the defendant]." In addition, the State offered the testimony of an expert interpreting the 3908 phone user's texts to other drug customers on December 12 and 13 as evidence of opioid trafficking. The jury convicted the defendant, and this appeal followed.

On appeal, the defendant challenges the trial court's evidentiary rulings with respect to the testimony of the victim's friend and the text messages from the user of the 3908 phone to other drug customers. He argues that the trial court erred when, prior to trial, it ruled that the testimony of the victim's friend was admissible under New Hampshire Rule of Evidence 406 as evidence of the victim's habit of buying opioids from the defendant. See N.H. R. Ev. 406. The defendant asserts that the court erred in two additional respects regarding this testimony. He contends that, even if the friend's testimony was admissible as habit evidence, the court erred when it determined prior to trial that the testimony would not be unfairly prejudicial under New Hampshire Rule of Evidence 403, see N.H. R. Ev. 403, and when, at trial, it overruled his hearsay objection and admitted the evidence under the residual hearsay exception, see N.H. R. Ev. 807. The defendant also appeals the trial court's pre-trial ruling admitting text messages between the user of the 3908 phone and other purported drug customers as "intrinsic" to the charged offense, or, alternatively, under New Hampshire Rule of Evidence 404(b). See N.H. R. Ev. 404(b).

The trial court has broad discretion to determine the admissibility of evidence, and we will not upset its ruling absent an unsustainable exercise of discretion. State v. Plantamuro, 171 N.H. 253, 255 (2018). When applying our unsustainable exercise of discretion standard of review, we determine only whether the record establishes an objective basis sufficient to sustain the discretionary judgment made. Id. To show that the trial court's decision is not sustainable, the defendant must demonstrate that the ruling was clearly untenable or unreasonable to the prejudice of his case. Id. With respect to the issues on which we are reviewing the trial court's pre-trial rulings, we limit our review to the proffers presented to the court before each ruling. State v. Nightingale, 160 N.H. 569, 573 (2010).

We first address the defendant's challenge to the court's pre-trial ruling that testimony of the victim's friend regarding the victim's past purchase of opioids from the defendant was admissible as habit evidence under Rule 406 to prove that it was the defendant who sold the victim fentanyl on the night of her death. As a threshold matter, the State contends that this argument is not

3

preserved for our review.  Because we ultimately rule in the State's favor, we assume, without deciding, that the defendant adequately preserved this issue for our review.

Turning to the merits, the defendant asserts that the State's in limine proffers were insufficient because the State failed to establish that the victim's behavior was "involuntary" or "semi-automatic," and that the victim's friend had knowledge that the victim frequently and consistently procured opioids from only the defendant.  We agree with the defendant that the proffer was insufficient and that the testimony was admitted in error, but conclude that this error was harmless beyond a reasonable doubt.

Rule 406 provides that:

> Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice.  The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness.

N.H. R. Ev. 406.  Although Rule 406 does not define "habit," we have characterized it as a "regular response to a repeated specific situation . . . which may become semi-automatic."  Lapierre v. Sawyer, 131 N.H. 609, 611 (1989) (quotation omitted); N.H. R. Ev. 406 Reporter's Notes (observing that habit evidence is similar to character evidence "only it is much more exacting").  The admissibility of habit evidence depends on the facts of each case.  Lapierre, 131 N.H. at 611.  For example, in a negligence action arising from a car accident, we affirmed the admission of evidence that the defendant, who had rented out the car that struck and injured the plaintiff, had a habit of testing his rental cars' brakes before renting them to customers.  Buxton v. Langan, 90 N.H. 13, 14-15 (1939) (preface to opinion); see also Barton v. Plaisted, 109 N.H. 428, 435 (1969) (affirming admission of testimony regarding decedent's customary driving speed along stretch of road where car accident giving rise to negligence action occurred); State v. Cornwell, 97 N.H. 446, 447 (1952) (affirming admission of testimony that it was sheriff's habit to have deputy assist him when attaching and repossessing a vehicle).

To meet the threshold for admissibility under Rule 406, the proponent's proffer in support of admission must "demonstrate a regular response to a specific situation."  Lapierre, 131 N.H. at 611.  In Lapierre, which involved a negligence action arising from an injury suffered during a racquetball match, the plaintiff contended that evidence of the defendant's prior conduct of losing his temper constituted a "habit" that led him to strike the ball in a manner that caused the plaintiff's injury.  Id. at 610-11.  The trial court excluded the evidence, determining that it did not constitute a regular response to a specific situation, and we agreed.  Id. at 611.  We reasoned that the plaintiff's proffer

4

that the defendant had "lost his temper in two or three previous games" was insufficient to show a regular response to a specific situation.  See id.

Here, the State has not identified the "specific situation" the victim was responding to when she purchased the opioids that led to her death.  See id. (identifying the specific situation at issue as when the defendant "f[ell] behind or los[t] important racquetball points").  However, assuming that the "specific situation" at issue here was the victim's need or desire to purchase opioids, the State had to make a proffer sufficient to show that the victim's "regular response" to that situation was to buy from the defendant.  See id. at 610-11.  The State proffered the following evidence during two pre-trial hearings on the issue: the friend and the victim had known each other for nine months and were "best friend[s];" approximately a week and a half before the victim's death, the friend was with the victim immediately before and after she purchased heroin from the defendant, and there are text messages between the victim's phone and the 3908 phone user that provide further evidence of that sale; and the friend told investigators that the defendant was the victim's "first choice" for buying opioids, that it was the victim's habit to buy opioids from him, and that the victim "liked" the defendant and would often talk about him.

We find this proffer insufficient to establish that the victim's purchase of opioids from the defendant was a "regular response" to her need to procure opioids.  At best, this evidence demonstrates that the victim preferred to buy opioids from the defendant and that she did in fact buy from him on at least one, or possibly two, occasions near the time of her death.  As in Lapierre, a general preference and two specific instances of the conduct at issue do not amount to a "regular response."  See Lapierre, 131 N.H. at 610-11.  In addition, we agree with those courts that have reasoned that certain patterns of criminal conduct do not meet the definition of "habit" because the conduct is not semi-automatic, as is conduct such as "going down a particular stairway two stairs at a time, or . . . giving a hand-signal for a left turn."  United States v. Troutman, 814 F.2d 1428, 1454-55 (10th Cir. 1987) (quotation omitted) (affirming exclusion of proposed habit evidence because "[e]xtortion or refraining from extortion is not a semi-automatic act and does not constitute habit").

Nor are we persuaded by the State's argument that Underhill v. Baker, 115 N.H. 469 (1975), supports a contrary result.  Underhill involved the admissibility of testimony about the plaintiff's regular purchase of beer in the context of a personal injury action arising out of a vehicle collision.  Underhill, 115 N.H. at 470-71.  In Underhill, we did not analyze whether the plaintiff's beer purchasing practices constituted a "regular response to a specific situation"; rather, we affirmed admission of evidence about those practices for the limited purpose of assessing the credibility of the plaintiff's testimony regarding how much he drank on the night of the collision.  Id. at 471.  Thus,

Underhill offers no support to the State in making a threshold showing that the victim's purchase of opioids from the defendant was a "regular response to a specific situation."

The State's pre-trial proffers fell short of establishing that the victim's regular response to the specific situation of needing opioids was to purchase them from the defendant. Accordingly, we conclude that the defendant has established that the court unsustainably exercised its discretion. Because we agree with the defendant that the court erroneously ruled before trial that the friend's testimony was admissible as habit evidence, we need not reach his additional arguments as to how the court erred regarding this same testimony.

The State argues that, even if the trial court erred in admitting the habit evidence, that error was harmless. It asserts that the proof of the defendant's guilt was overwhelming and that the friend's testimony was inconsequential in light of the "alternative evidence . . . identifying the defendant as the person who supplied the lethal dose of fentanyl." We agree with the State.

To establish that an error was harmless, the State must prove beyond a reasonable doubt that the erroneously admitted evidence did not affect the verdict. State v. Papillon, 173 N.H. 13, 28 (2020). An error may be harmless beyond a reasonable doubt if the other evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight and if the improperly admitted evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. Id. at 28-29. In conducting this analysis, we consider the other evidence presented at trial as well as the character of the erroneously admitted evidence itself. Id. at 29.

To convict the defendant of distribution of a controlled drug with death resulting, the State was required to prove that the defendant knowingly dispensed a controlled drug to the victim, the victim ingested or injected that controlled drug, and her ingestion or injection of the controlled drug caused her death. See RSA 318-B:2, I; RSA 318-B:26, IX. The parties agree that the primary issue at trial was whether the defendant — and not someone else — knowingly sold the victim the fatal dose of fentanyl.

The other evidence specifically identifying the defendant as the victim's source for fentanyl on the night of her death was overwhelming. The jury heard extensive evidence connecting the defendant to the 3908 phone. Most notably, the defendant identified himself as the owner of that phone by listing the 3908 number on employment paperwork approximately two and a half months prior to the victim's death. The jury also had before it testimony from the defendant's friend that the 3908 phone belonged to the defendant near the time of the victim's death, phone records showing that the victim's phone labeled the 3908 number as "Ben Mackenzie," and text messages between the 3908 phone user and the defendant's mother and brother. The texts between

6

the phone user and the defendant's brother discuss going "to Mom's." The texts from the defendant's mother include one referring to the 3908 phone user as "Ben" and a series of texts sent on December 13 reminding the recipient about a probation appointment. Trial testimony established that, in December of 2016, the defendant was on probation and that he had to report to the probation office on December 14 — the day after his mother's reminder text.

The jury also heard compelling evidence connecting the defendant, through the phone, to the December 12 sale to the victim. It heard testimony first establishing that the user of the 3908 phone had access to opioids on the day of the victim's death. A detective, qualified as an expert by the court "in the field of narcotics and drug investigations," testified that texts to and from the phone user established that that person had picked up two "fingers" of heroin or fentanyl from a supplier in Massachusetts on the evening of December 12.

Substantial evidence further established that the 3908 phone user sold opioids to the victim on December 12. A detective involved in the investigation recounted the communications between the user of the 3908 phone and the victim on December 12 from the time the victim left home at approximately 10:00 p.m. to when she returned home at 11:00 p.m. Shortly after 10:00 p.m., the victim contacted the phone user requesting "a 30" and the recipient replied "[g]etting it ready." Over the next thirty minutes, the two individuals exchanged texts about where to meet and the phone user provided the victim directions to a skate park. At 10:33 p.m., the victim called the phone user and then texted, "Where are you?" The recipient replied, "Almost there. You need to have patience," and the victim responded, "I know." The last communications between the two individuals were phone calls at 10:47 p.m. and 10:56 p.m. The State's expert emphasized the significance of these communications by "interpret[ing]" them as demonstrating that the victim "was about to meet up [with the 3908 phone user] to buy .30 of fentanyl [or] heroin."[1] The jury heard testimony that the victim returned home between 11:00 p.m. and 11:15 p.m., that she had injected fentanyl, and that her time of death was before 1:00 a.m.

In addition, the jury heard evidence refuting the defendant's theory that the victim obtained opioids from another source that night. The defendant elicited testimony that, in addition to the defendant, the victim had a history of getting opioids from two other individuals. In response, the State offered testimony that there was no evidence that the victim ever had contact with one of the potential sources, and that, although the victim was texting with the second source about buying opioids at the same time she was texting with the

---

[1] The defendant did not object to the trial court's qualification of the witness as an expert or to the witness's testimony "interpret[ing]" the text messages.

3908 phone user, her texts demonstrate that she did not meet that potential source on December 12. Thus, the jury heard overwhelming other evidence of the defendant's guilt.

We also find the erroneously admitted testimony inconsequential when compared to the nature and strength of this other evidence. See Papillon, 173 N.H. at 30. The testimony at issue was not lengthy:

Q Okay. And I want to be very clear about this December timeframe. Was [Ben Mackenzie] a name that [the victim] had told you about?

A Yes.

Q Okay. And what had she told [you] she was doing in relation to Ben Mackenzie?

A She had told me that she had gotten drugs off of him.

Q And specifically, did she talk about what type of drug?

A Opiates.

From this testimony, the jury could have inferred that, because the victim previously bought from the defendant, she did so on the occasion that led to her death. See N.H. R. Ev. 406. The impact of this testimony was, however, blunted on cross-examination when the friend testified that the victim had also told her the names of two other individuals from whom the victim had purchased opioids.

Although the jury could have drawn the above inference, it also could have concluded that the friend's testimony supported an inference that the defendant was one among several of the victim's sources for opioids. Further, we are not persuaded by the defendant's argument that, because this testimony implicated him in prior sales of a deadly drug to the victim, it was especially consequential in that it made him appear "morally," if not legally, culpable. Any negative "moral" inference the jury drew from the defendant's past sales to the victim was overshadowed by the weight of the other evidence demonstrating the defendant's culpability for the specific sale at issue, which resulted in the victim's death. In short, in comparison to the other evidence that the defendant sold the fatal dose to the victim — including the detailed text exchange leading up to the subject sale — the friend's testimony was inconsequential. Accordingly, we conclude that the State has met its burden of proving that the erroneously admitted testimony did not alter the verdict, and the court's error was, therefore, harmless beyond a reasonable doubt. See Papillon, 173 N.H. at 30.

8

We turn next to the defendant's argument that the trial court erred when it admitted texts exchanged between the 3908 phone user and other drug customers because they were neither intrinsic to the charged crime, nor admissible under Rule 404(b). The challenged texts, which were sent on December 12 and 13, related to the sale of opioids by the phone user to individuals other than the victim. The State counters that the defendant did not preserve this issue for appellate review, and that, in any event, the trial court's ruling was a sustainable exercise of discretion. It also argues that, even if the court erred, any error was harmless. For the purposes of this appeal, we assume, without deciding, that the defendant has preserved this issue for our review. We need not, however, decide whether admission of the challenged texts was erroneous because we agree with the State that any error was harmless. See Papillon, 173 N.H. at 28.

As described above, the jury heard overwhelming other evidence of the defendant's guilt. Although the challenged texts provided proof that the defendant, as the user of the 3908 phone, was engaged in opioid trafficking at the time of the victim's death, because there was abundant other evidence of that fact, the challenged texts were cumulative.[2] The jury heard evidence that, on December 12, the 3908 phone user picked up two "fingers," or approximately 20 grams, of heroin or fentanyl from a supplier in Massachusetts. It also heard evidence that, because the supplier had given the drugs to the phone user without requiring payment up front, that person needed to sell the drugs in order to repay the supplier. Indeed, the texts show that, on December 12, the supplier told the 3908 phone user that that person owed the supplier $650 and, on December 13, the supplier inquired how much had been sold so far, to which the phone user replied, "I got, like, 450 so far. . . . Day's not over yet, though."

This evidence, viewed in conjunction with the texts between the victim and the 3908 phone user, established that the defendant was involved in an opioid trafficking operation. The challenged text messages pertaining to uncharged drug sales were merely cumulative evidence on that point. See State v. Enderson, 148 N.H. 252, 256 (2002) (concluding that any error in admitting uncharged gambling activity was harmless because such evidence was cumulative of other evidence that the defendant ran a gambling operation).

Nor are we persuaded by the defendant's arguments that the State failed to meet its burden of proving that the challenged evidence was inconsequential in relation to the other evidence of guilt. He contends that the text messages from drug customers other than the victim were especially consequential because some of the texts contained references to the phone user as "Ben" or

---

[2] To the extent that certain text messages were offered into evidence to prove the defendant's identity, the defendant conceded at oral argument that the texts addressing the defendant by name were admissible for that purpose.

"Benny." He argues that this makes the evidence of the drug sales to other customers more consequential than the evidence of the sale to the victim because, in her texts, the victim never addressed the phone user by name. However, the victim did identify the defendant as the recipient of her texts when she labeled the 3908 number saved on her phone as "Ben Mackenzie."

Finally, the defendant argues that the challenged texts were particularly consequential because they allowed the State to emphasize, in its closing argument, "the degradation that was experienced by the addicted buyers" of opioids. He contends that the challenged texts allowed the State to illustrate the highly addictive quality of opioids and the severity of opioid withdrawal symptoms. Although without the challenged texts in evidence the State may not have been able to demonstrate the impact of opioid addiction in the same way at trial, we are satisfied, based upon our review of the record, that admission of the challenged evidence did not deny the defendant a fair verdict. See Papillon, 173 N.H. at 30. The import of the challenged evidence paled in comparison to other irrefutable and compelling evidence of the severe consequences of opioid addiction: the victim's death by overdose at the age of nineteen.

In sum, we conclude that the challenged text messages were not only cumulative, but were also inconsequential in relation to the other evidence of the sale of fentanyl to the victim — in particular, the texts between the victim and the user of the 3908 phone leading up to the victim's death. Accordingly, we further conclude that the State has met its burden of proving that any error in admitting the texts between the user of the 3908 phone and other drug customers did not affect the verdict, and was, therefore, harmless beyond a reasonable doubt. See id.

Additionally, we must consider the impact of the court's presumed error in admitting the challenged texts together with its error in admitting the friend's testimony. See State v. Hickey, 129 N.H. 53, 62 (1986). Even considered together, however, this evidence was inconsequential in relation to the character and strength of the other evidence of the defendant's guilt. Our review of the record supports the conclusion that the State has met its burden of proving beyond a reasonable doubt that the errors, even when considered together, did not affect the verdict. See id.

Affirmed.

HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.

10